UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL DUHS,<br><br>     Petitioner,<br><br> – against –<br><br>MICHAEL CAPRA, Superintendent of<br>Sing Sing Correctional Facility,<br><br>     Respondent. | **MEMORANDUM, ORDER, AND JUDGMENT**<br><br>13-CV-1056 |

**Appearances**

 **For Petitioner:**

   Norman Trabulus
   Law Office of Norman Trabulus
   345 Seventh Avenue, 21st Floor
   New York, NY 10001
   212-221-7811
   ntrabulus@gmail.com

 **For Respondent:**

   New York State Attorney General's Office
   alyson.gill@ag.ny.gov

   Richmond County District Attorney's Office
   appeals@RCDA.nyc.gov

   Anne Elizabeth Grady
   Richmond County District Attorney's Office
   Appeals Bureau
   130 Stuyvesant Place
   Staten Island, NY 10301
   718-556-7120
   anne.grady@rcda.nyc.gov

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   Introduction ..................................................................................................... 3
II.  Ripeness ......................................................................................................... 3
III. Facts ................................................................................................................ 4
   A.   The Bathtub: People's Exhibit 11 ............................................................ 6
   B.   The Bathtub: People's Exhibit 12 ............................................................ 7
   C.   The Bathtub: People's Exhibit 13 ............................................................ 8
   D.   Admissibility and Competency Hearings .............................................. 13
   E.   Resident Dr. Gold's Testimony Relating Child's Declaration ............... 14
   F.   Jury Trial ............................................................................................... 23
IV. Procedural History ........................................................................................ 23
   A.   Grand Jury Indictment ........................................................................... 23
   B.   Jury Trial ............................................................................................... 24
   C.   Appeal to Appellate Division ................................................................ 24
   D.   Appeal to the New York State Court of Appeals ................................... 25
   E.   Writ of Coram Nobis .............................................................................. 29
   F.   Denial of Appeal from Denial of Writ of *Coram Nobis* ....................... 30
   G.   Federal Habeas Proceedings .................................................................. 30
V.  Standard of Review ....................................................................................... 31
   A.   Deference to State Court ........................................................................ 31
   B.   "Contrary to" and "Unreasonable Application" .................................... 32
   C.   "Clearly Established Federal Law" ........................................................ 33
   D.   Harmless Error ...................................................................................... 34
VI. Inadequate Assistance of Counsel ................................................................ 35
VII.   Confrontation Clause ............................................................................ 36
   A.   Law ........................................................................................................ 36
     1.   As Analyzed by the State Courts ...................................................... 36
     2.   As Determined by the Supreme Court .............................................. 37
       a)   Ohio v. Roberts ........................................................................... 37
       b)   Crawford v. Washington .............................................................. 38
       c)   Companion Cases: Davis v. Washington & Hammon v. Indiana ................ 39
       d)   Michigan v. Bryant ..................................................................... 40
       e)   Subsequent Supreme Court Cases ............................................... 42
       f)   As Analyzed by the Court of Appeals for the Second Circuit .................... 43
       g)   As Analyzed By Other Courts ..................................................... 43
     3.   Confrontation Rule in Present Case .................................................. 45
       a)   Context ........................................................................................ 45
       b)   Combined Inquiry of Interrogator's and Declarant's Positions ................ 46
         (1)   Step One: The Declarant's Perspective .................................. 46
         (2)   Step Two: The Interrogator's Perspective ............................... 47
         (3)   Step Three: The Circumstances of Questioning ..................... 47
   B.   Application of Facts to Law ................................................................... 48

a)    Mistaken Reliance on Supreme Court Dicta ................................................. 48
b)    Unreasonable Application of Clearly Established Supreme Court Law ....... 48
    (1)    The Declarant's Perspective ..................................................... 49
    (2)    The Interrogator's Perspective ................................................. 52
    (3)    The Circumstances of Questioning ......................................... 53
c)    Harmless Error Review ............................................................................... 54
    (1)    The Statute: Assault in the First Degree .................................. 54
    (2)    Prosecution's Questionable Case: Defendant's Intent to Scald the Child 55
    (3)    Critical Importance of Child's Declaration ............................. 56
    (4)    Child's Declaration Not Cumulative ....................................... 57
d)    Policy Implications ..................................................................................... 57
e)    Case Pending Before the United States Supreme Court .............................. 59
VIII.    Conclusion ......................................................................................................... 61

# I.    Introduction

Petitioner is granted a writ of *habeas corpus*. 28 U.S.C. § 2254 (2012).

A three-year-old boy was scalded in a bathtub. The critical evidence: that day, in response to a pediatric medical resident's questioning, the child said: petitioner "would not let me out." Transcript of Record ("Trial Tr.") at 161:14–16, 162:9 ("he wouldn't let me out"), *People v. Duhs*, Richmond Cty. Indict. No. 43/2006 (N.Y. Crim. Ct. Feb. 6–9, 2007).

The boy did not testify, even though, at the prosecution's request, the court had found him competent. Transcript of Record ("Pretrial Hr'g Tr.") at 366:15–367:2, *People v. Duhs*, Richmond Cty. Indict. No. 43/2006 (N.Y. Crim. Ct. Feb. 1–2, 2007).

Introduction of the child's declaration violated petitioner's Sixth Amendment right of confrontation. U.S. Const. amend. VI.

# II.    Ripeness

A jury convicted petitioner Michael Duhs of Assault in the First Degree, N. Y. Penal Law § 120.10(1), a felony, and Endangering the Welfare of a Child, N. Y. Penal Law § 261.10(1), a misdemeanor. *People v. Duhs*, 947 N.E.2d 617, 618 (N.Y. 2011) (summarizing lower court's findings). He was sentenced to twenty years imprisonment on the first count, followed by five

years post-release supervision, and a concurrent definite term of one year on the second. *See* Pet'r's Section 2254 Mot. ("Pet'r's Br.") 1, ECF No. 1; Resp't's Aff. in Opp. ("Resp't's Aff.") 2, ECF No. 7. He had a criminal record which was not introduced at trial. Pretrial Hr'g Tr. at 39:8–44:23. He has served some eight years. *See* Pet'r's Br. 1.

The parties have stipulated that the state collateral attack was "adjudicated on the merits," and this petition is ripe for decision. *See* Tr. of Civ. Cause for Non-Evid. Hr'g ("H'rg Tr.") 61:13–18, ECF No. 48; *see also Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (An "adjudication on the merits" by a state court occurs "when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.") (internal quotation marks and citations omitted).

## III.  Facts

Early on September 16, 2005, Stacey Andersen, the child's mother, left her home on Staten Island to go to medical assistant school. Trial Tr. at 77:7–16, 78:7–8, 82:18–83:3, 85:10–25, 115:3–7, 116:17–18 (Andersen, S.). Her three-year-old son remained with petitioner, her romantic partner with whom she lived. *Id.* at 78:5–78:16, 82:14–15, 111:24–112:7.

The mother, the petitioner and the child, so far as the evidence showed, had a loving, caring relationship. *Id.* at 112:6–7, 114:14–20. The mother and petitioner had known each other for more than ten years. *Id.* at 111:15–25. She testified at trial that she loved him, *id.* at 112:6–7, and agreed that he was "very good" to the child. *Id.* at 114:16–17. They both worked to keep a clean home. *Id.* at 112:8–18 (Andersen, S.); *id.* at 249:7–8 (Ramirez). The child, according to a child abuse investigator, was "properly taken care of." *Id.* at 250:17–20 (Ramirez). He had his own room; he never wanted for food. *Id.* at 112:19–113:4 (Andersen, S.), 249:9–11 (Ramirez). He had "lots of toys." *Id.* at 249:15–17 (Ramirez). The record showed no history of violence by

petitioner against the mother or child, and no reason to think that petitioner had ever, or would ever, intentionally hurt the child. *Id.* at 114:18–24 (Andersen, S.), 250–251 (Ramirez) (inspection of the house reveals no indications of child abuse).

On days when the mother went to school, petitioner would generally wake the child, dress him, and take him to preschool. *Id.* at 84:19–25, 115:11–117:4 (Andersen, S.). When petitioner did not work, it was his practice to stay home with the child while the mother attended school. *Id.* at 84:8–11.

The three lived in a one bathroom bungalow, which contained a bathtub. *Id.* at 79:4–11. The tub presented a potential hazard, especially for a child. The water flowed quickly from the faucet and it was "very hot;" the mother had had a dispute with the landlord about the water going from warm to very hot without any warning. *Id.* at 81:4–82:3, 123:1–8. The only witness for the defense, the child's grandfather, verified that, on the day in question, the water heater, located outside the house, read "hot," the "highest setting." *Id.* at 351:2–353:25 (Andersen, M.).

The tub had a makeshift design. It had the opposite orientation of most tubs: the showerhead with faucets was installed on one end, the drain on the other. The drain had no stopper. *Id.* at 80:2–81:3 (Andersen, S.); Repro. of Trial Ex.'s 11, 12, and 13 ("People's 11–13"), ECF No. 44-1–44-3; *see infra* Parts III.A, B, & C. Above the drain was an overflow hole, measuring approximately 2.5 to 3 inches in diameter. Trial Tr. at 300:14–17 (Hemmer). The hole did not connect to anything. People's 11–13; Trial Tr. at 300:8–13, 318:2–9 (Hemmer). On the other side of the hole, leaning against the outside of the tub, was a thin wooden plank, jerry-rigged to block the hole. Trial Tr. at 109:13–109:19 (Andersen, S.). In the space between the board and the hole, a loose pipe jutted up at angle from the floor. *Id.* at 317:25–318:9, 322:1–5 (Hemmer). *See* People's 11–13; Resp't's' Ltr., Dec. 10, 2014, ECF No. 46 (pictures placed in

evidence at trial were relied upon by respondent).

### A.  The Bathtub: People's Exhibit 11



**B.    The Bathtub: People's Exhibit 12**



**C.     The Bathtub: People's Exhibit 13**

Case 1:13-cv-01056-JBW   Document 44-1   Filed 12/09/14   Page 3 of 3 PageID #: 2128



According to the mother, she received a call from the petitioner at approximately noon on the day in question, informing her of the scalding in what might be characterized as a critical admission by petitioner of some fault through inattention, *id.* at 87:9–22 (Andersen, S.):

> [Asst. District Attorney] Stacey, what did the defendant tell you on the phone?
>
> [The Mother] The baby's feet got burned in the bathtub. I said, how did the baby's feet get burned. He said, I really can't recall exactly how it happened, everything is pretty much a fog.
>
> From what I can remember *he said that he turned the hot water on and he ran out to smoke a cigarette or whatever he did and he heard the baby crying, came running in the house, that [the child's] hands were stuck in the hole, he was trying to get his hand out of the hole then he realized that the water was so hot . . . .*

*Id.* at 87:25-88:17 (emphasis added).

Petitioner told the mother on the phone that the child's feet were "a little red but it was no big deal." *Id.* at 118:7–10. The mother apparently told the petitioner to put the child's feet in cold water. *Id.* at 312:16–18 (Hemmer), 242:1–4 (Ramirez), *but see id.* at 119:5–33 (Andersen, S.) (mother disputed this account). Petitioner told the mother that he had put the child's feet in cold water right after the incident. *Id.* at 138:15–139:2 (Andersen, S.).

Arriving home late that afternoon, the mother found the petitioner and the child in the child's room. Trial Tr. at 92:25–93:25 (Andersen, S.); *but see* 337:17–338:10, 340:10–16 (Barbaria) (petitioner was in separate room when they arrived home). She observed the injuries, took an ice pack from the freezer, applied it to the child's burns, and took the child to the Staten Island University Hospital. *Id.* at 93:1–13 (Andersen, S.), 339:11–19, 340:17–18 (Barbaria).

The petitioner accompanied her, along with her ten-year-old niece. *Id.* at 122:10–17 (Andersen, S.). In the car en route to the hospital, the niece heard the child say, using the mother's nickname for the petitioner, "Babe put me in hot water." *Id.* at 341:2–3 (Barbaria). There is no evidence that the petitioner responded to this statement.

The child was admitted to the ICU burn unit. *Id.* at 95:16–20. He was cared for by treating physicians "Dr. Cooper and Dr. Finkelstein," *id.* at 95:21–22 (Andersen, S.) and Dr. Tricia Jean Moriority Gold, a resident doctor. *Id.* at 158:5–159:8, 164:11–20 (Gold). While the child was being treated that evening, petitioner stayed at the hospital with the mother; petitioner was "upset and crying". *Id.* 95:14–15, 122:12–20 (Andersen, S.).

The following day, the child was treated by Rachel Lucente, a registered nurse specializing in wound care. *Id.* at 254:25–256:3 (Lucente). Dr. Michael Cooper, a burn expert, also treated the child. *Id.* at 42:2–11 (Cooper). He testified that the child sustained "second and third degree burns to his right and left lower legs which continued over his ankles and involved both feet;" the injuries reached "the lower third of his legs." *Id.* at 44:3–13. There was a "very distinct line between nonburned and burned skin [that was] . . . symmetric on the right and left legs and feet," consistent with an "immersion injury," as opposed to "accidental scalding." *Id.* at 45:9–25. On direct examination, he explained the distinction to the jury:

> *Q What is the difference in appearance between an immersion burn and an accidental scalding or splash burn?*
>
> *A An immersion burn is usually indicated by a very distinct line of demarcation between skin that's burned and skin that's not burned. There's usually an absence of splash marks.*

*Id.* at 38:24–39:5 (emphasis added).

Cooper admitted that he was not 100% certain of the cause of the burns. *Id.* at 62:13–63:1. He testified that the burns were not uniform: the child's bottom of his left heel did not appear to be burned at all. *Id.* at 61:1–21. He stated that children's skin is "thinner than the skin of adults;" water does not burn an adult in the same manner as it may burn a child. *Id.* at 60:9–19. He admitted that contact with cold water for a sustained period could exacerbate the injury. *Id.* at 62:3–12.

Another expert, Dr. Stephen Ajl, who reviewed hospital records, but did not examine the child, testified that the demarcation lines and lack of "splash marks" were definitely indicative of an "inflicted immersion burn injury." *Id.* at 217:4–218:9 (Ajl). He explained his theory:

Q     When you say inflicted, could you explain that to the jury?

A     *It means that somebody did this to a child. Either a child is placed in hot water and not allowed to move or the child is placed into a tub, for instance, where there is no water and the child is held firmly so they can't move and then the tub can be filled with water.*

Q     Is it possible to have demarcation lines without being immersed in an immersion burn?

A     I don't think so. I can't think of a scenario where that would happen.

*Id.* at 217:19–218:5 (Ajl) (emphasis added).

In oral statements to the mother, to the Emergency Child supervisor/investigator Edgar Ramirez at the hospital, to Detective James Hammer at the hospital and at the home, petitioner stated that he put the child in the bathtub, left him unattended, and, hearing him screaming, returned to find him standing in the hot water with his hand stuck in the overflow drainage hole. *Id.* at 88:2–12 (Andersen, S.), 231:8–15 (Ramirez), 297:19–24 (Hemmer).

Petitioner gave various answers as to why he left the child alone: "to get some clothes for the child," *id.* 230:18–22 (Ramirez), to "answer the front door," *id.* at 297:19–24 (Hemmer), to "talk to a neighbor," *id.* at 234:8–13 (Ramirez), "to smoke a cigarette," *id.* at 301:3–9 (Hemmer), or a combination of these activities. *Id.* at 231:8–15 (Ramirez).

The Emergency Child Services supervisor/investigator Ramirez testified that petitioner told him that "he had placed the child in the tub. The child had opened the water." *Id.* at 234:8–10 (Ramirez). Petitioner told Detective Hemmer that the child had probably been throwing toys into the drainage hole and gotten his hand stuck inside. *Id.* at 299:14–20 (Hemmer).

Detective Hemmer testified that when he viewed the scene later in the evening, no toys were present outside the tub or in the drainage hole. *Id.* at 300:22–23; *cf. id.* at 233:19–21 (Ramirez) (observed no toys inside the drainage hole). But when the mother returned to the apartment a month later, during which time the petitioner had been in custody and therefore had no access to the area, she found toys inside the drainage hole. *Id.* at 126:7–11 (Andersen, S.).

The evening of the incident, the detective took photos of the bathtub. *Id.* at 302:1–9 (Hemmer); *see supra* Parts III.A, B & C. He later testified that he only saw one toy in the bathroom. *Id.* at 320:16–23 (Hemmer). Ramirez testified that he "observed . . . a big toy inside the tub." *Id.* at 233:1–10 (Ramirez).

Their testimony contradicted People's Exhibit 11, which is in evidence. *See supra* Part III.A. Exhibit 11 shows three toys. *Id.* A big toy is in the tub, under the faucet. The second toy, a small green car, and the third, a grey and blue dolphin, are perched in a metal soap-holder basket above the tub. They are to the left of, and on almost the same level, as the three knobs that control the temperature and the flow of water into the tub. On the outer lip of the tub, directly beneath the metal basket, sits a soap dish. It appears to have a small, white piece of soap

inside it.  *Id.*  Nothing is placed on the opposite lip of the tub closest to the right most faucet knob.

It appears that, in the course of photographing, the toys and other items were moved.  The last photograph, Exhibit 13, *supra* Part III.C, shows the whole tub.  In contrast to Exhibit 11, the metal basket now appears to be devoid of toys; a detached, plastic drain stopper appears in the metal basket; the small green car appears on the outer ledge of the tub in the soap dish, directly beneath the metal basket.  There is no big toy in the tub below the faucet.  On the opposite outer lip of the tub, closest to the right most faucet knob, there now appears to be a whitish-blue block of soap.  On a lip of the drain-end of the tub, rests a hot pink bar of soap.

In Exhibit 12, *see supra* Part III.B, a photo of the drain-end of the tub, what appears to be a plastic, detached, drain stopper rests on the lip of the tub.  The pink soap is not in sight.

### D.    Admissibility and Competency Hearings

On February 2, 2007, during a break in jury selection, a preliminary hearing was held to determine the admissibility of the child's statements to the resident doctor.  Pretrial Hr'g at 334:15–351:5, 367:3–370:10.  The child was not questioned about the incident.  *Id.*at 358:19–365:8.

The child stated that he was four years old, correctly identified the colors of objects, gave the names of family members, identified his favorite television show and the superheroes he liked, refused to show his fingers, said he did not know the ABCs, just counting, and was eager to demonstrate his counting but refused to identify his favorite food.  *Id.* at 359:1–363:23.  The court then asked him questions about truthfulness:

The Court: [redacted], one more question.  Tell me what a lie is?

[The Child]: A lie is when you get punished and you lie to mommy what else?

. . .

The Court: [redacted],do you know what the truth is?  You told us what a lie is.

Can you tell us what the truth it?

[The Child]: Yeah.

The Court: Tell us.

[The Child]: A lie is when you lie and then you always lie to someone and then

that's not nice to do.

The Court: Is it nice to tell the truth?

[The Child]: Yeah.

The Court: Do you tell the truth?

[The Child]: Yeah.

The Court: And what happens if you lie?

[The Child]: I get punished.

*Id.* at 364:9–24.

The court ruled the child competent:

Having heard this young man, it seems to me that he's a relatively
intelligent four[-]year[-]old.  He can count.  He certainly knows his
colors.  He seems to be cognizant of the difference between the
truth and a lie; and, if you lie, you get punished.  Otherwise, he
seems intelligent certainly enough, clearly enough in my view to
permit the reception of unsworn testimony.

*Id.* at 366:15–23.

### E. Resident Dr. Gold's Testimony Relating Child's Declaration

Dr. Gold, then a pediatric medical resident at Staten Island University Hospital, provided

14

the key testimony.  The transcript of the relevant portions of her direct examination at the trial follows:

> Q [Asst. District Attorney]: Were you working at the Staten Island University Hospital on September 16th of 2005?
>
> A    Yes.
>
> Q.    Do you remember where you were assigned that day?
>
> A    I was assigned to the emergency room, the pediatric emergency room.
>
> Q    Do you remember what hours you were working that day?
>
> A    7:00 a.m. to 7:00 p.m.
>
> Q    Do you remember a patient by the name of [redacted]?
>
> A    Yes.
>
> Q    Do you remember how old [redacted] was at the time?
>
> A    Three
>
> Q    Do you remember what your first contact was with [redacted] on that date?
>
> A    Yes, he was brought in in his mother's arms to the emergency room and his mother stated that he had been burned.
>
> Q    Did you begin treatment of [redacted] at that time?
>
> A    Yes.
>
> Q    How did you begin treatment of [redacted]?
>
> A    Initially we did an assessment of his vital signs to make sure that he was not in shock, that he was breathing, that he was not unstable in any way. Then we started treating the skin and placing intravenous lines so we can

give him medication such as antibiotics, pain medicine, fluids, then started

to address the skin with certain burn ointment and continue treatment.

Q    Do you remember what his demeanor was when he arrived at the

emergency room?

A    He was – it's a little difficult.  A combination of scared.  He was very

quiet.  He was very detached.

Q    What were his injuries?

. . .

A    He had significant loss of skin from what appeared to be burns from the

shines [*sic*] down throughout both feet bilaterally.

Q    Do you remember what time he was brought into the emergency room?

A    About 5:00 p.m.

. . .

Q    Did there come a time when you were with [redacted] more or less

without anyone around?

A    It's an emergency room so everyone has access to the area of triage where

patients first come in.

But, there was a time where I was alone with [redacted] where everyone

had primarily cleared the emergency room where I continued to speak to

him to have him try to tell me what had happened to him.

Q    And when you were with [redacted] mostly alone at this point, were you

treating him at that time?

A    Treating him, trying to figure out details about what happened, continuing

| | |
|---|---|
| | to assess him and examine him physically and develop a rapport with him which we need to do with children. |
| Q | Had you given [the child] morphine at this time? |
| A | No. |
| Q | Do you remember about when you did give him morphine? |
| A | Shortly after 6:00 p.m. [I]t took awhile to get the intravenous line placed. |
| Q | So you had—about what time did you have this conversation with [the child] alone? |
| A | Before that maybe, I don't know exactly 15, 20 minutes something before 6 o'clock. |

Trial Tr. at 158:5–161:5 (Gold).

Her testimony, about the child's declaration, which inculpated petitioner, was critical:

| | |
|---|---|
| Q | Did you ask [redacted] anything? |
| A | *Yes. I asked him multiple times if he could explain to me what had happened* to him but I was a stranger to him, he wouldn't speak very much. |
| | And as I continued to ask him and he felt more comfortable when it was just my presence with him. He started to talk to me. |
| | *And when I asked him approximately the third time what had happened, he said he wouldn't let me out. Meaning, he wouldn't let me out of the bathtub.* |

[Defense Counsel]: Objection.

The Court: I'll sustain the objection as to the meaning. You can tell us exactly

what you recall the person saying.

A       I was referring to the bathtub when I was speaking to the child.  So, he

wouldn't let me out is why I made the inference or the assumption.

Q       Can you repeat that.

Did you ask him something at this time?

A       Yes, what happened.  You know, why didn't you get out of the tub?  Why

did you get in the tub? Anything, trying to elicit information from him.

Q       His response to that question was what?

A       He wouldn't let me out.

Q       Again this was before or after you gave him the morphine?

A       This is before.

*Id.* at 161:6–162:12 (emphasis added).

The resident doctor testified that her questions were for the purpose of medical treatment

as well as a part of her ethical obligation to determine if he had been abused:

A       There are a number of reasons why *I would need to ask him that question.*

*Primarily for medical treatment*, one, to find out as much information as I

can to help with the time line of the treatment.

*Two, it's my hippocratic oath and ethical duty as a doctor as a*

*pediatrician and advocate for children to pursue anything that might help*

*in determining what happened with injuries that are suspicious at all of*

*child abuse, it's part of my job.*

18

Q      Did there come a time when you received a medical history of [redacted] that day from anyone in his family?

A      A medical – more specific.

Q      Did you speak to anyone in his family about what happened to [redacted]?

A      Yes.

Q      Who did you speak with?

A      I spoke with [the petitioner].

Q      What did you ask him?

A      I asked him if anything had been done to the child medically, you know, had he been—had he placed any medicine or ice or given him Tylenol, pain medicine anything before the child was brought to the emergency room.

Q      Did the defendant respond to that question?

A      He did.

Q      What was his response?

A      No.

Q      Did you speak with any law enforcement individuals that day?

A      Yes.

[Asst. District Attorney] Thank you.  No further questions.

*Id.* at 162:16–164:1 (emphasis added).

On cross examination, no new relevant information was supplied except for the fact that no record was made of the child's statement:

[Defense Counsel]:

Q       Doctor Gold, you were the first physician to see this child, is that correct?

A       One of them, yes.

Q       Were you the first doctor to treat him, yes or no?

        Were you the first doctor, not the other emergency room personnel, were

        you the first doctor to begin treatment of [redacted]?

A       No, there were three of us in the room, the three doctors.

Q       Were you the resident on duty at the time?

A       Yes.

Q       As the resident on duty, you basically become the treating physician?

A       The attending is my supervisor.

Q       The attending present?

A       Yes.

Q       When you were treating [redacted], you were the one directly responsible

        for his care at that point?

A       Yes

Q       As part of your duties in the emergency room, you treat patients, correct

A       Yes.

Q       You make records of those treatments, is that correct?

A       Yes.

Q       Now a record of a treatment is called a chart in a hospital, right?

A       Yes

Q       So each patient has a chart?

A      Yes.

Q      And that's so the next doctor who comes to treat the child or the next nurse knows what happened before, correct?

A      Yes.

Q      That's the purpose of keeping a chart?

A      Yes.

Q      Those charts are kept in the ordinary course of business, correct?

A      Yes.

Q      You detail on the chart your interaction with the patient, is that correct?

A      Yes.

Q      Now you indicated that there came a time when you were alone with [redacted].

Can you describe the setting that you were in at that point, just you and the child?

A      Certainly.

It is what we call a triage area for more serious injuries. It's open. It's not a closed room. And there can be a curtain that can cover. There are chairs several feet away for people to sit but, the area itself is like an alcove.

That's the area where I was speaking.

Q      When you say these curtains, you mean curtains around the bed.

A      Curtains, yeah.

Q      To give a patient some degree of privacy?

A      Yes.

Q       Were the curtains drawn when you were with [redacted]?

A       No.

Q       Pushed back by the wall by the end area?

A       Basically.

Q       When you were speaking with [redacted], you said at first he wouldn't speak to you?

A       Correct.

Q       *Then you asked him these questions so that you could have information for your treatment, correct?*

A       *Yes.*

Q       *Did you record these answers anywhere?*

A       *No.*

Q       Now isn't the purpose of a chart to record interaction and information from a patient, yes or no?

A       Yes.

Q       But you did not write down anywhere he wouldn't let me out, did you?

A       No, I didn't.

*Id*. at 164:2–167:9 (emphasis added).  She apparently reported this conversation with the child to the police.  *Id.* at 171:12–15.

At a hearing outside the presence of the jury to determine admissibility, the testimony of resident Dr. Gold was almost identical with her testimony at trial.  *See* Pretrial Hr'g. at 338:12–350:24.

22

### F. Jury Trial

The government called the following witnesses: Dr. Michael Cooper, treating burn specialist; Stacey Andersen, the mother; Dr. Tricia Jean Moriority Gold, pediatric resident; Dr. Stephen Ajl, an independent child abuse and burn expert; Edgar Ramirez, Emergency Child Services supervisor/ investigator; Rachel Lucente, an attending nurse, Detective James Hemmer, investigating police officer; and Elisa Barbaria, the niece of the mother.

The defense called Martin Andersen, the mother's father.

## IV. Procedural History

### A. Grand Jury Indictment

Petitioner was initially indicted by a grand jury on the charges of Assault Second Degree, *see* N.Y. Penal Law § 120.0(9), a felony, and Endangering the Welfare of a Child, *see* N.Y. Penal Law § 260.10(1), a misdemeanor. Decision and Order at 1, *People v. Duhs*, Richmond Cty. Indict. No. 285/2005 (N.Y. Crim. Ct. Nov. 16, 2005).

He moved to inspect and dismiss the indictment. *See* N.Y.Crim. Proc. Law § 210.20(1)(b) & (c). The trial court dismissed the felony charge of Assault Second Degree, with leave for the people to represent, for failure to properly instruct the grand jury on an intent element. Decision and Order at 1, *Duhs*, Richmond Cty. Indict No. 285/2005.

After representation to the grand jury, petitioner was indicted on the higher charge of Assault in the First Degree, *see* N.Y. Penal Law § 120.10(1), and reindicted on the charge of Endangering the Welfare of a Child. Affirmation in Response to Defendant's Motion to Dismiss Indictment at 4, *People v. Duhs*, Richmond Cty. Indict. No. 43/2006 (N.Y. Crim. Ct. July 25, 2006) (stating that petitioner was reindicted on February 15, 2006).

### B. Jury Trial

No individual with direct knowledge of the events immediately prior to and during the child's scalding testified. Petitioner chose not to testify. Although the child was deemed competent to provide unsworn testimony, the prosecution did not call him as a witness. Pretrial Hr'g at 366:15–23; Transcript of Record, *People v. Duhs*, Richmond Cty. Indict. No. 43/2006 (N.Y. Crim. Ct. Feb. 6–9, 2007). *See supra* Part IV.D.

Petitioner was convicted of Assault in the First Degree, *see* N.Y. Penal Law § 120.10(1), and Endangering the Welfare of a Child, *see* N.Y. Penal Law § 260.10(1).

### C. Appeal to Appellate Division

Petitioner appealed to the Appellate Division of the New York Supreme Court on two grounds: 1) resident Dr. Gold's testimony violated his Sixth Amendment right to confrontation; and 2) the people's expert witness testimony invaded the fact-finding province of the jury.

Petitioner contended that the trial court erred in admitting testimony of a physician who had interrogated the child "because the prosecutor did not establish that the child's failure to get out of the bathtub was relevant to his medical treatment;" he argued that this made the child's statement inadmissible hearsay and testimonial in violation of his constitutional right to confront witnesses. Brief for Defendant-Appellant at 13, *People v. Duhs*, 884 N.Y.S.2d 479 (N.Y. App. Div. 2d Dep't 2009) (No. 07-06034). As to the expert testimony that the child's burns were intentionally inflicted, petitioner argued that "[t]his testimony was improper because the jury could have determined whether the burns had been inflicted intentionally or had occurred by accident without an expert opinion." *Id.* at 29–30.

The Appellate Division affirmed, holding that the child's declaration to resident Dr. Gold was nontestimonial and therefore its admission did not violate petitioner's Sixth Amendment

right; the contention that the expert witness testimony invaded the fact-finding province of the jury was held to be unpreserved for appellate review. *See People v. Duhs*, 884 N.Y.S.2d 479, 481 (N.Y. App. Div. 2d Dep't 2009).

Petitioner was granted a leave to appeal to the New York Court of Appeals on the issue of petitioner's Sixth Amendment right to confrontation. *See People v. Duhs*, 929 N.E.2d 1010 (N.Y. 2010).

### D.    Appeal to the New York State Court of Appeals

On appeal to the New York State Court of Appeals, petitioner argued that the child's statement was testimonial because it "was a direct accusation of [the] essential element of the crime." Brief for Defendant-Appellant at 32, *People v. Duhs*, 947 N.E.2d 617 (N.Y. 2011) (No. 2011-0059). Petitioner asserted that for this statement to be relayed to the jury through a "poised, professional, and seemingly neutral adult witness," and not also by the child, constituted a violation of his Sixth Amendment confrontation right. *Id.* at 44–45. He also argued that the statement was inadmissible hearsay under New York law. *Id.* at 47.

The Court of Appeals affirmed the Appellate Division's ruling, holding that the declaration was nontestimonial because resident Dr. Gold's primary purpose in interrogating the child had been to provide medical care. *See People v. Duhs*, 947 N.E.2d 617, 619–20 (N.Y. 2011). Because it contains a critical misconception of the confrontation rule, the full Court of Appeals opinion is set out below and discussed in *infra* Part VII.A.1.

> Defendant, who was babysitting his girlfriend's three-year-old son, allegedly placed the child's feet and lower legs into a tub filled with scalding hot water, resulting in second and third degree burns. When the child's mother returned home approximately five hours later, defendant and the mother took the child to the hospital,

where he was examined and treated by an emergency room pediatrician.

At trial, the court permitted the pediatrician to testify about a statement the child made outside the presence of his mother and defendant. Specifically, when the pediatrician asked the child why he did not get out of the tub, he responded, "he wouldn't let me out." The pediatrician did not include this statement in the child's medical records, nor did the child testify at trial. Defendant was convicted of assault in the first degree and endangering the welfare of a child, and, on appeal, the Appellate Division affirmed. 65 AD3d 699 (2009). A Judge of this Court granted leave. 14 NY3d 887 (2010).

The only issues before us are whether the trial court erred in allowing the pediatrician's testimony concerning the child's statement in evidence as germane to the child's medical diagnosis and treatment, and whether its admission violated defendant's constitutional right to confront the witnesses against him.

Supreme Court properly concluded that the child's statement was germane to his medical diagnosis and treatment and therefore was properly admitted under that exception to the hearsay rule. When seeking treatment for injuries, there is a "strong inducement for the patient to speak truly of his pains and sufferings' and therefore 'statements expressive of [a patient's] present condition are permitted to be given as evidence only when made to a physician for the purposes of treatment." *Davidson v Cornell*, 132 NY 228, 237–238 (1892).

Here, the pediatrician testified that, during her initial assessment, she observed that the child had sustained second and third degree burns to his feet and legs. The pediatrician testified that she asked the child how he had been injured to determine the time and mechanism of the injury so she could properly administer treatment, the type of treatment being dependent on when and how the child was injured. Moreover, the pediatrician testified that by asking the question, she was trying to ascertain whether the child had a predisposing condition, such as a neurological disorder (e.g., was prone to seizures or developmental delays) that may have prevented him from getting out of the bathtub.

Defendant nevertheless contends that, by allowing the pediatrician to testify as to what the child told her, he was deprived of his Sixth Amendment right to confront the witness against him in violation of *Crawford v Washington*, (541 US 36 [2004]) and *Davis v Washington*, (547 US 813 [2006]). The United States Supreme Court held in those cases that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who [does] not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Davis*, 547 US at 821, quoting *Crawford*, 541 US at 53-54).

At issue here is whether the child's statement to the pediatrician was testimonial, as defendant claims, or nontestimonial, as the People assert. In *Davis*, the Supreme Court held that only "testimonial statements" can "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause," and "[i]t is the testimonial character of the statement that separates it from other

hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." 547 US at 821. "Statements are nontestimonial when made in the course of . . . interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to . . . meet an ongoing emergency' and 'are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Michigan v Bryant*, 562 U.S., —, 131 S.Ct. 1134, 1154, [2011], quoting *Davis*, 547 US at 822).

The "primary purpose" test reflects an 'important distinction between a statement (generated through police interrogation or otherwise) that 'accuses' a perpetrator of a crime . . . versus one that serves some other nontestimonial purpose[.]" <u>People v Rawlins</u>, 10 NY3d 136, 148 [2008], *cert denied sub nom. Meekins v New York*, 557 US — , 129 S Ct 2856 [2009]). Significantly, "[t]he lodestar . . . that emerges from *Davis* is the purpose that the statement was intended to serve." (*[I]d*.) Indeed, the Supreme Court recently explained that

> "[w]hen, as in *Davis*, the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules

of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryan*t, 562 US at —, 131 S Ct at 1155).

Applying the primary purpose test here, it is evident that the statement "he wouldn't let me out" was not of a testimonial character, since the primary purpose of the pediatrician's inquiry was to determine the mechanism of injury so she could render a diagnosis and administer medical treatment. Moreover, the Supreme Court has noted that "statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules" and not the Confrontation Clause. *Giles v California*, 554 US 353, 376 [2008]; *see Bryant*, 562 US at — n.9, 131 S Ct at 1157 n.9.

Finally, it is of no moment that the pediatrician may have had a secondary motive for her inquiry, namely, to fulfill her ethical and legal duty, as a mandatory reporter of child abuse, to investigate whether the child was potentially a victim of abuse. Her first and paramount duty was to render medical assistance to an injured child. Accordingly, the order of the Appellate Division should be affirmed.

*See People v. Duhs*, 947 N.E.2d at 618–20.

No appeal was taken to the United States Supreme Court.

### E.     Writ of Coram Nobis

Petitioner sought a writ of *coram nobis* in the Appellate Division *pro se*, arguing that he received ineffective assistance of appellate counsel because issues of petitioner's due process

rights, including speedy trial, double jeopardy, and the right to effective assistance of trial counsel had not been raised on appeal. He contended that when he attempted to discuss these issues with his appellate counsel they "were all rejected with a simple explanation of 'no merit,'" and the outcome would have been different had they been argued during appeal. Petition for Writ of Error, [Coram] Nobis with Supporting Affidavits at 16, *People v. Duhs*, 943 N.Y.S.2d 912 (N.Y. App. Div. 2d Dep't 2012) (No. 2007-06034).

On May 23, 2012, the Appellate Division denied petitioner's motion for writ of *coram nobis*. *See People v. Duhs*, 943 N.Y.S.2d 912 at 913.

### F. Denial of Appeal from Denial of Writ of *Coram Nobis*

The New York Court of Appeals denied petitioner leave to appeal from the denial of a writ of *coram nobis*. *See Duhs*, 975 N.E.2d 918 (N.Y. 2012).

### G. Federal Habeas Proceedings

In February of 2013, petitioner filed a *pro se* petition for a writ of *habeas corpus*, alleging that 1) the resident doctor's testimony was hearsay evidence which violated Petitioner's Sixth Amendment confrontation right; 2) ineffective assistance of trial counsel and 3) ineffective assistance of appellate counsel.

Counsel was appointed. *See* Criminal Justice Act, 18 U.S.C. § 3006A; CJA 20 Appointment of and Authority to Pay Court Appointed Counsel, ECF No. 5.

Argument on petitioner's *habeas* petition was heard in a non-evidentiary hearing. Tr. of Civil Cause for Non-Evidentiary Hr'g ("Hr'g Tr."), ECF No. 48. Petitioner withdrew his claim for ineffective assistance of trial counsel, leaving two alleged bases for relief: 1) violation of his confrontation right and 2) ineffective assistance of appellate counsel.

## V.    Standard of Review

Petitioner's *habeas* petition is governed by 28 U.S.C. § 2254 (2012), as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, a federal

court may grant a writ of *habeas corpus* to a state prisoner on a claim that was "adjudicated on

the merits" in state court *only* if it concludes that the adjudication of the claim:

> (1) resulted in a decision that *was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court* of the United States; *or*

> (2) resulted in a decision that *was based on an unreasonable determination of the facts* in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

Deference is accorded to state court determinations.  *See infra* Part V.A.

### A.    Deference to State Court

"Federal habeas review of state convictions frustrates both the States' sovereign power to

punish offenders and their good-faith attempts to honor constitutional rights."  *Harrington v.

Richter*, 131 S. Ct. 770, 787 (2011) (internal quotation marks and citations omitted).  Relief is

only merited in extreme circumstances, to "guard against extreme malfunctions in the state

criminal justice systems."  *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011) (internal quotation marks

and citations omitted).

A "federal habeas court may overturn a state court's application of federal law only if it is

so erroneous that there is no possibility fairminded jurists could disagree that the state court's

decision conflicts with [the Supreme] Court's precedents."  *Nevada v. Jackson*, 133 S. Ct. 1990,

1992 (2013) (per curiam) (internal quotation marks and citations omitted).  This is a "highly

deferential standard" that gives state-court decisions "the benefit of the doubt."  *Hardy v. Cross*,

132 S. Ct. 490, 491 (2011) (per curiam) (internal quotation marks and citation omitted).

"AEDPA likewise imposes a highly deferential standard for reviewing claims of legal error by the state court." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786. "[W]e cannot grant habeas relief where a petitioner's claim pursuant to applicable federal law, or the U.S. Constitution, has been adjudicated on its merits in state court proceedings in a manner that is not manifestly contrary to common sense." *Santone v. Fisher*, 689 F.3d 138, 148 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 390 (2012) (quoting *Anderson v. Miller*, 346 F.3d 315, 324 (2d Cir. 2003)).

Entitled to great weight are state court findings of fact. 28 U.S.C. § 2254(e)(1) (stating that state court factual findings may not be disturbed except upon a showing of "clear and convincing evidence"). *See Smith v. Phillips*, 865 F. Supp. 2d 271, 278–79 (E.D.N.Y. 2012), *aff'd sub nom. Smith v. Scully*, No. 12-1561-PR, 2014 WL 7011916 (2d Cir. Dec. 15, 2014); *Burt*, 134 S. Ct. at 15 ("[A] state-court factual determination is not unreasonable merely because the federal *habeas* court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 131 S. Ct. 841, 849 (2010)).

### B.     "Contrary to" and "Unreasonable Application"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law *or* if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000) (emphasis added); *see Bell v. Cone*, 122 S. Ct. 1843, 1850 (2002) (same).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,*

120 S. Ct. at 1523; *see also McMillon v. Culley*, 380 F. App'x 63, 64 (2d Cir. 2010), *cert. denied*,

131 S. Ct. 426 (2010). The application must be "objectively unreasonable," not merely wrong;

even "clear error" will not suffice. *Lockyer v. Andrade,* 123 S. Ct. 1166, 1175 (2003) (internal

citations omitted).

"In determining whether a state court's application of Supreme Court precedent was

unreasonable, a habeas court must be guided by the level of specificity of the relevant

precedent's holding, because 'the range of reasonable judgment can depend in part on the nature

of the relevant rule.'" *Contreras v. Artus*, No. 13-1117, 2015 WL 294239, at *10 (2d Cir. Jan.

23, 2015) (citing *Yarborough v. Alvarado,* 124 S. Ct. 2140, 2149 (2004)). As the Supreme Court

held:

> [i]f a legal rule is specific, the range may be narrow. Applications
> of the rule may be plainly correct or incorrect. Other rules are more
> general, and their meaning must emerge in application over the
> course of time. Applying a general standard to a specific case can
> demand a substantial element of judgment. As a result, evaluating
> whether a rule application was unreasonable requires considering
> the rule's specificity.

*Yarborough,* 124 S. Ct. at 2149.

### C.     "Clearly Established Federal Law"

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the

Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v.

Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal citations and quotation marks omitted); *see

also Williams*, 120 S. Ct. at 1506 (federal habeas courts deny relief if it "is contingent upon a

rule of law not clearly established by United States Supreme Court precedent at the time the state

court conviction became final").

"[W]hen deciding whether a state-court decision was 'contrary to' or an 'unreasonable application of . . . clearly established Federal law,' a federal habeas court will generally consider only those Supreme Court opinions issued prior to the state court's denial of relief. But a Supreme Court decision issued after the relevant state court decision may be considered if it *illustrates* the proper application of a constitutional principle." Federal Habeas Manual § 3:27 (June 2014) (emphasis in original) (citing *Wiggins v. Smith*, 123 S. Ct. 2527, 2535–36 (2003)).

### D.     Harmless Error

If a "court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless," *Howard*, 406 F.3d at 122 (citations omitted), meaning it "had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 115 S. Ct. 992, 994 (1995) (internal quotation marks and citations omitted); *see also Howard*, 406 F.3d at 135 (granting writ where state court engaged in an unreasonable application of established law, resulting in constitutional error, and error was not harmless).

To determine whether the error was harmless, courts consider five factors: "(1) the overall strength of the prosecution's case; (2) the importance of the witness'[s] testimony; (3) whether the testimony was cumulative; (4) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; and (5) the extent of cross-examination otherwise permitted." *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014) (internal citations omitted) (affirming grant of writ of *habeas corpus*) (citing *Delaware v. Van Arsdall*, 106 S. Ct. 1431, 1438 (1986)).

"When a [federal judge in a habeas proceeding] has grave doubt about whether a trial error . . . had substantial and injurious effect or influence in determining the jury's verdict, that

error is not harmless. And, the petitioner must win." *Wood v. Ercole*, 644 F.3d 83, 99 (2d Cir.

2011) (holding that petitioner's videotaped statement made after he invoked his right to counsel

was wrongfully admitted at trial and not a harmless error) (citing *O'Neal v. McAninch*, 115 S. Ct.

992, 994 (1995)) (internal quotation marks omitted).

## VI.    Inadequate Assistance of Counsel

At the hearing in this court, the petitioner withdrew his claim of inadequate assistance of

trial counsel. H'rg Tr. 60:15–61:21. He continued to seek a writ of *habeas corpus* based on the

adequacy of his state appellate counsel. *Id*.

"[L]egal representation violates the Sixth Amendment if it (1) falls 'below an objective

standard of reasonableness,' as indicated by 'prevailing professional norms,' and (2) the

defendant suffers prejudice as a result." *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013)

(citing *Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984)).

An examination of the brief submitted to the Appellate Division indicates that petitioner's

claim is frivolous. *See* Petition for Writ of Error, [Coram] Nobis with Supporting Affidavits 16,

*People v. Duhs*, 943 N.Y.S.2d 912 (N.Y. App. Div. 2d Dep't 2012) (No. 2007-06034), *aff'd*,

975 N.E.2d 918 (N.Y. 2012).

As any astute (and reasonable) appellate counsel would do, counsel fixed on the only two

points that might warrant reversal: (1) the application of the confrontation clause, as discussed

below; and (2) the admissibility of expert witness testimony. *See* Brief for Defendant-Appellant

13, 29–30, *People v. Duhs*, 884 N.Y.S.2d 479 (N.Y. App. Div. 2d Dep't. 2009) (No. 07-06034).

*See also Jones v. Barnes*, 103 S. Ct. 3308, 3313 (1983) ("[E]xperienced advocates since time

beyond memory have emphasized the importance of winnowing out weaker arguments on appeal

and focusing on one central issue if possible, or at most on a few key issues."). Appellate

35

counsel's work exceeded minimum standards under prevailing professional norms.  The inadequacy claim is frivolous.

The only basis for granting the writ of *habeas corpus* is for a violation of the Constitution's confrontation clause discussed below.  *See infra* Part VII.

## VII.    Confrontation Clause

### A.    Law

The Sixth Amendment's confrontation clause provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.

#### 1.    As Analyzed by the State Courts

The trial court held a pretrial hearing at which the resident doctor testified and was cross-examined.  Pretrial Hr'g at 334–51 (Gold).  The court deemed the child's statement to be "germane and relevant to diagnosis and treatment" and therefore to fall within the hearsay exception for statements made to medical personnel.  *Id.* at 367–70 (court).  It was not, the court held, "testimonial" and therefore did not violate petitioner's confrontation right.  *Id.* at 370.

Affirming the conviction, the Appellate Division found no error in the trial court's admission of the child's statement under the hearsay exception for statements made to medical personnel for the purpose of diagnosis and treatment.  *See People v. Duhs*, 884 N.Y.S.2d 479, 479 (N.Y. App. Div. 2d Dep't 2009).  Because the resident doctor testified that she asked the question "in order to ascertain whether the child had any neurological injury or deficit," the statement fell, according to the court, within the hearsay exception.  *Id.*  It was "not testimonial" because it was "elicited in furtherance of the medical treatment necessary to address the ongoing emergency caused by the child's condition."  *Id.*

36

On appeal to the Court of Appeals, petitioner argued that the trial court's admission of the physician's testimony was an error that violated his constitutional right to confront his accuser. Brief for Defendant-Appellant at 17, 42, *People v. Duhs*, 947 N.E.2d 617 (N.Y. 2011). As noted in *supra* Part IV.D, the Court of Appeals affirmed the Appellate Division's finding that the statement "'he would not let me out' was not of a testimonial character, since the primary purpose of the pediatrician's inquiry was to determine the mechanism of injury so she could render a diagnosis and administer medical treatment." *Duhs*, 947 N.E.2d at 619–20. "It is of no moment," the Court of Appeals went on to state, "that the pediatrician may have had a secondary motive for her inquiry." *Id.* That secondary motive, "to fulfill her ethical and legal duty, as a mandatory reporter of child abuse, to investigate whether the child was potentially a victim of abuse," was not controlling because, the opinion stated, "[h]er first and paramount duty was to render medical assistance to an injured child." *Id.*

The New York Court of Appeals relied in part on *dicta* in *Giles v. California*, 128 S. Ct. 2678, 2692–93 (2008), and *dicta* in a footnote in *Michigan v. Bryant,* 131 S Ct. 1143 (2011) to rule that statements to medical personnel may be excluded by hearsay rules, but not by the confrontation clause. But neither case supported this decision. In *Giles*, the court was specifically addressing the application of the confrontation clause in forfeiture by wrongdoing cases. In *Bryant*, the court was merely quoting *Giles*. Neither case involved statements made to medical personnel, or a child declarant, the critical issues in the instant case.

### 2.    As Determined by the Supreme Court

#### a)    *Ohio v. Roberts*

The Supreme Court had interpreted the confrontation clause to allow the admission of an "unavailable witness's out-of-court statement . . . so long as it has adequate indicia of

37

reliability." *Crawford v. Washington*, 124 S. Ct. 1354, 1358 (2004) (summarizing holding in

*Ohio v. Roberts*, 100 S Ct. 2531 (1980)).  Reliability was established if the statement fell "within

a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.*

*See Idaho v. Wright*, 110 S. Ct. 3139, 3152 (1990) (holding that out-of-court declaration in sex

abuse case of three-year-old not qualified to testify did not satisfy "indicia of reliability"

requirement so as to satisfy confrontation clause).

### b)      *Crawford v. Washington*

In 2004, the "Supreme Court's decision in *Crawford* initiated a sea change in

[c]onfrontation [c]lause jurisprudence." *McCarley v. Kelly*, 759 F.3d 535, 544 (6th Cir. 2014)

(relying on *Crawford* to hold that psychologist's questioning of a child about his mother's

murder ten days following event was "testimonial" and granting writ of *habeas corpus*).  A seven

justice majority held that "where testimonial evidence is at issue[,] . . . the Sixth Amendment

demands what the common law require[s]: unavailability and a prior opportunity for cross-

examination." *Crawford*, 124 S. Ct. at 1374.

Statements made "during a station-house interrogation about a stabbing were testimonial,

and their admission[,] when the [declarant's] husband, the accused, had 'no opportunity' for

cross-examination due to spousal privilege[,] made out a Sixth Amendment violation."

*Michigan v. Bryant*, 131 S. Ct. 1143, 1152–53 (2011) (summarizing holding in *Crawford*).  The

Court in *Crawford* left "for another day" a "comprehensive definition [of testimonial]," but held

that, "at a minimum," "testimonial" statements include "prior testimony at a preliminary hearing,

before a grand jury, or at a former trial; and . . . police interrogations."  Crawford, 124 S. Ct. at

1374.  The Court noted that non-police officers may act as police officers.  *Id.* at 1365 ("The

involvement of government officers in the production of testimonial evidence presents the same

risk, whether the officers are police or justices of the peace.").

    *c)*    *Companion Cases:* **Davis v. Washington & Hammon v. Indiana**

Two years later, an eight-member majority held that the confrontation clause only applies to "testimonial hearsay." *Davis v. Washington*, 126 S. Ct. 2266, 2274 (2006). Faced with two domestic violence cases involving police interrogations, the Court considered the definition of "testimonial," holding that statements are "testimonial when the circumstances *objectively* indicate that there is no . . . ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273–74 (emphasis added). Thus, a recording of a 911 call identifying the defendant—recorded in the midst of the domestic disturbance—was "nontestimonial" because the victim: (1) "was speaking about events *as they were actually happening*;" (2) she faced an ongoing emergency—a "bona fide physical threat;" (3) the "nature of what was asked and answered . . . viewed objectively . . . was such that the elicited statements were necessary to be able to *resolve* the present emergency" rather than to learn about past events; and (4) the call was conducted under frantic circumstances that a reasonable 911 operator would not find to be safe. *Id.* at 2276 (emphasis in original).

By contrast, the statements made in the consolidated case, *Hammon v. Indiana*, were testimonial. There, the police officers responded to a call of a domestic disturbance and found the alleged victim in a separate room from her accuser; she told them everything was fine. While she spoke with police officers, the accuser attempted unsuccessfully to enter the room. She then drafted an affidavit. *Id.* at 2272. The Court deemed her statements testimonial because (1) they were not made in the course of an ongoing emergency ("no immediate threat to her person"); and (2) the police officer was attempting to divine not "'what is happening,' but rather 'what

happened.'"  *Id*. at 2278.  "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime."  *Id.*

The Court limited the scope of its holding, noting that it did not constitute an "exhaustive classification" of testimonial statements—much less even a comprehensive classification of statements gleaned from police interrogations.  *Davis*, 126 S. Ct. at 2273.  It was "unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.'"  *Id.* at 2274 n.2.  Nonetheless, it opined that some "statements made in the absence of any interrogation" could also be classified as testimonial.  *Id.* at 2274 n.1, 2276 (noting "the English cases that were the progenitors of the [c]onfrontation [c]lause did not limit the exclusionary rule to prior court testimony and formal deposition.") (citing *Crawford,* 124 S. Ct. at 1364, 1365 n.3).

In a footnote, the *Davis* Court made a point important for the present case: when determining whether the confrontation clause was violated, focus must be primarily on the statements of the declarant, not the questioner.  *Id.* at 2274 n.1.  The Court wrote: "[E]ven when interrogation exists, *it is in the final analysis the declarant's statements, not the interrogator's questions, that the [c]onfrontation [c]lause requires us to evaluate*."  *Id.* (emphasis added).

### d)   *Michigan v. Bryant*

*Michigan v. Bryant*, decided in 2011, restated the "primary purpose" test.  131 S. Ct. 1143 (2011).  The Court sustained the admission of statements made by a mortally wounded man to the police concerning the identity of a gunman.  These statements were "nontestimonial."  *Id.* at 1150.  Decision was explicitly reserved on "whether and when statements made to someone *other* than law enforcement are testimonial."  *Id.* at 1155 n.3 (emphasis added).  *See also United States v. Burden*, 600 F.3d 204, 225 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 953 (2011) ("[T]he

40

broader significance of *Davis* [was] the *declarant's purpose* in speaking matters.") (emphasis added).

In *Bryant*, the Court recognized the flexibility of the confrontation rule. While the underlying circumstances are important, the "formality [of the encounter] is not the sole touchstone of our primary purpose inquiry." *Bryant*, 131 S. Ct. at 1160 (internal quotation marks and citations omitted). It pointed out that, "although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution, informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id.* (internal quotation marks and citations omitted).

Both the majority and the dissent agreed in *Bryant* that the primary purpose inquiry required looking at the statements and actions of both the interrogator and the declarant; they "provide *objective evidence of the primary purpose of the interrogation*." *Id.* at 1160 (emphasis added). In the majority opinion by Justice Sotomayor, the Court held that a "combined inquiry" often requires looking to the "content and tenor of [the] questions." *Id.* at 1162 (internal quotation marks and citations omitted). It is a "highly context-dependent" exercise. *Id.* (quoted phrase used in reference to the inquiry required to determine whether there was an "ongoing emergency," not to the broader "combined inquiry" itself).

Concurring, Justice Thomas criticized the "primary purpose" test because of its uncertainty in application. *Id.* at 1167 (Thomas, J. concurring). He emphasized the "highly informal circumstances" of the declaration. *Id.* "The police questioning," he pointed out, "was not a formalized dialogue" and "bore no indicia of solemnity." *Id.* (internal quotation marks and citations omitted).

In his dissent, Justice Scalia gave greater weight than did the majority to the state of mind of the declarant and his understanding of why he was being asked the questions and the purpose of his answers. *Id.* at 1169–70 (Scalia, J. dissenting). ("The hidden purpose of an interrogator cannot substitute for the declarant's intentional solemnity or his understanding of how his words may be used."). He bluntly stated, "The declarant's intent is what counts." *Id.* at 1168.

Justice Ginsburg, in her dissent, agreed that the declarant's intent was paramount. *Id.* at 1176 (Ginsburg, J. dissenting). She wrote, "I agree with Justice Scalia that [t]he declarant's intention is what counts." *Id.* She also explained why the Court was not considering the historical importance of the dying declaration exception in excluding application of the confrontation clause. *Id.* at 1177.

Notably, the majority returned to an emphasis on reliability of the *Ohio v. Roberts* era, stating that in determining the primary purpose of an interrogation, "standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.* at 1155.

### e) Subsequent Supreme Court Cases

Subsequent Supreme Court decisions involving the confrontation clause are not decisive in deciding the present case. None are majority opinions; none involve statements made by children to medical personnel; none are substantively on point. *See Giles*, 128 S.Ct. at 2693 (holding that "forfeiture by wrongdoing" is not an exception to the Sixth Amendment's confrontation requirement); *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2532 (2009) (ruling that admission of state laboratory report without opportunity to cross-examine the analysts who composed it violated confrontation clause); *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2715–16 (2011) (finding that confrontation clause does not permit the prosecution to introduce a report containing a laboratory report containing a testimonial certification, made in

order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not

sign the certification or personally perform or observe the performance of the test reported in the

certification); *Williams v. Illinois*, 132 S. Ct. 2221, 2240–41,2243–44 (2012) (holding that the

admission of an expert's opinion about a DNA report that he did not author does not violate the

confrontation clause because, *inter alia*, the purpose of the opinion was to catch a criminal still at

large, not to target the defendant).

### f)        As Analyzed by the Court of Appeals for the Second Circuit

The Court of Appeals for the Second Circuit has yet to rule on whether statements made

by children to medical personnel are testimonial.  It recognized that it is the declarant's state of

mind that controls in interpreting the confrontation clause, "*Crawford* at least suggests that the

determinative factor in determining whether a declarant bears testimony is the *declarant*'s

*awareness or expectation* that his or her statements may later be used at a trial."  *United States v.*

*Saget*, 377 F.3d 223, 228 (2d Cir. 2004), *supplemented*, 108 F. App'x 667 (2d Cir. 2004), *cert.*

*denied*, 125 S. Ct. 938 (2005) (emphasis added); *Burden*, 600 F.3d at 225 (interpreting *Davis* to

mean that the declarant's purpose is paramount).

### g)        As Analyzed By Other Courts

Most courts have deemed a child declarant's statements to medical personnel in child

abuse cases to be "nontestimonial."  *See* Petition for Writ of Certiorari at 18–23, *Ohio v. Clark*,

No. 13-1352, *petition for cert. filed* (May 8, 2014); *see also State v. Hill*, 336 P.3d 1283, 1289

(Ariz. Ct. App. 2014) (statement by pregnant teenage sexual assault victim to a forensic medical

examiner in an emergency room identifying the perpetrator was nontestimonial); *State v. Buda*,

195 N.J. 278, 308 (2008) (statements made by three-and-a-half-year-old child abuse victim to a

member of child abuse special response team were nontestimonial because primary purpose of

the response team working interrogating child was to ensure child's future well-being); *People v. Cage*, 155 P.3d 205, 207 (Cal. 2007) (teenager's statements, in response to surgeon's question "what happened," were nontestimonial because question was aimed at helping medical treatment); *People v. Vigil*, 127 P.3d 916, 924 (Colo. Sup. Ct. 2006) (seven-year-old child's statements to doctor regarding sexual abuse during sexual assault examination were not testimonial under *Crawford* test where questions aimed at identifying and relieving pain and mother was present); *State v. Vaught*, 682 N.W.2d 284, 291 (Neb. 2004) (statement of victim that accused defendant to emergency room doctor was nontestimonial under *Crawford* because it was made for the purpose of medical treatment, and thus admission of statement through physician's testimony did not constitute violation of confrontation clause). *But see McCarley v. Kelly,* 759 F.3d 535, 546 (6th Cir. 2014) (statements by a three-year-old child to a child psychologist working at the direction of law enforcement were testimonial under *Crawford*); *Hernandez v. State,* 946 So.2d 1270, 1282–83 (Fla. Dist. Ct. App. 2007) (child sexual assault victim's responses to questions asked by nurse were testimonial because the primary purpose of the colloquy was to gain information for use in future criminal prosecution).

In finding statements nontestimonial, some courts have relied on the assertion that a child could not anticipate his or her statements would be used at trial. *See Blount v. Hardy*, 337 F. App'x 271, 271 (4th Cir. 2009) (three-year-old's statements to therapist regarding alleged sexual abuse nontestimonial because victim had no way to know statements would be used at trial); *State v. Brigman*, 632 S.E.2d 498, 506–07 (N.C. 2006) (statements to pediatrician identifying perpetrator of sexual abuse were nontestimonial because no reasonable child under three years of age could understand that statement could later be used at trial); *State v. Krasky*, 696 N.W.2d 816, 820 (Minn. Ct. App. 2005) (even though questioning of five-year-old sexual abuse victim

by nurse practitioner had been arranged by police and child-protection worker, responses by child victim, who was shielded from police presence, were nontestimonial because child could not anticipate her answers would be used in a prosecution); *Com. v. DeOliveira*, 849 N.E.2d 218, 225–26 (Mass. 2006) (six-year-old's statements to a doctor about where a sexual assault had taken place were nontestimonial because child could not anticipate her answers would be used in a criminal prosecution).

According to one review of the cases, the "only exception" for "statements of children to doctors and nurses who are the first to examine the child after the report of assault" is "the specific issue of the identity of the perpetrator, with a few cases treating the part of the child's statement that names the perpetrator as testimonial based on its accusatory nature." Robert P. Mosteller, *Testing the Testimonial Concept and Exceptions to Confrontation: "A Little Child Shall Lead Them,"* 82 Ind. L.J. 917, 950–51 (2007) (collecting cases).

### 3. Confrontation Rule in Present Case

#### a) Context

The central work of the justice system is to "ascertain[] the truth and secur[e] a just determination." Fed. R. of Evid. 102; s*ee generally Some Difficulties in Devising Rules for Determining Truth in Judicial Trials*, 66 Colum. L. Rev. 223, 229 (1966).

When confronting a declaration describing a past event, both rules of evidence and the Constitution are designed to get at the truth and to protect accuracy—as far as is practicable; this is the essential job of the hearsay rules. The law asks: what is the probability that the declarant observed accurately, remembered accurately, and stated accurately what he remembered in a way that the communicant could accurately understand? The confrontation clause is not interpreted to hobble this inquiry by "deliberately subordinat[ing] accurate adjudication." *See* Tom Stacy,

*The Search for the Truth in Constitutional Criminal Procedure*, 91 Colum. L. Rev. 1369, 1374 (1991) (discussing the Fourth Amendment).

The Constitution protects individuals against an almost all-powerful state. "The central concern of the [c]onfrontation [c]lause is to ensure the reliability of the evidence against a criminal defendant." *Maryland v. Craig*, 110 S. Ct. 3157, 3163 (1990) (cited by *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012)).

### b)      *Combined Inquiry of Interrogator's and Declarant's Positions*

Reliance on the declarant's position as well as the interrogator's, the "combined inquiry," is established Supreme Court law. This nuanced application must be applied to the special facts in the instant case—a medical professional acting as an interrogator pursuant to state law requirements; a three-year-old child as the only eyewitness declarant; and a prosecutor's decision not to call the child, although he was deemed competent to provide unsworn testimony. *Accord Burden*, 600 F.3d at 224 ("no court can say whether a particular kind of statement is testimonial until it has considered that kind of statement in an actual case"). The following framework guides application of Supreme Court law in a case such as the present one:

### (1)      Step One: The Declarant's Perspective

The inquiry begins with an objective analysis of the declarant's purpose in speaking. If he believes that information is being given for possible future use, he may, depending on the circumstances: (a) be more careful and take steps to be more accurate; (b) be less forthcoming and therefore less accurate; or (c) be unaffected by this knowledge.

One appropriate line of inquiry is whether the declarant's response is designed to protect his own possible position in any future punishment or prosecution. Whether the declarant's statement was motivated by self-serving considerations may substantively affect whether it

constituted an accurate reflection of what he remembered and/or intended to relate.

Such inquiries mark an acknowledgment of the role of reliability, which necessarily continues to undergird *Crawford*. Determining the probative force of the hearsay and application of *Crawford*'s confrontation rule share the same goal: to prevent a false or questionable finding of fact with respect to defendant's guilt.

(2)　　Step Two: The Interrogator's Perspective

Next considered is the perspective of the interrogator. To what extent are the questions and answers focused on obtaining evidence from a declarant who appears to possess information relevant to a possible subsequent prosecution or similar punitive action? Considered is how the interrogator's view of the probability of eliciting truthful answers may affect how she frames the question, her demeanor, and how she communicates with the declarant. Since the interrogator will normally testify, the jury can evaluate whether the interrogator had the opportunity to observe and remember accurately what she thinks she heard the declarant say. The central question is whether her questions, and the way she asked them, provide the trier of fact with reliable—and often critical—evidence without the testimony of the declarant.

(3)　　Step Three: The Circumstances of Questioning

Considered is the formality of the situation, including the location of the questioning and who was present. Evaluated is whether an emergency is in progress or has passed so that only a declaration about historical facts is being elicited. Does the sense of crisis affect the feelings of urgency of the questions and person being questioned? Does the pace and degree of formality improve the probability of truth telling?

### B. Application of Facts to Law

#### a) Mistaken Reliance on Supreme Court Dicta

The New York Court of Appeals relied on Supreme Court *dicta*, as opposed to clearly established law, concerning statements made by patients to doctors in the course of receiving medical treatment. *See supra* Parts II.D., Part VII.A.1. This was a clear error. In *dicta* in *Giles*, the Supreme Court had stated that "statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules" and not by the confrontation clause. *Giles*, 128 S. Ct. at 2693. But *Giles*, in which the Court actually sustained a confrontation clause challenge, did not involve a statement made to a treating physician or that contained in a medical record, or a statement by a young child. Rather, it addressed the question of whether the confrontation clause applied in cases involving forfeiture by wrongdoing. The purpose of the *dicta* was to clarify that the holding did not mandate the wholesale exclusion of hearsay under the confrontation clause. It is not controlling in the present case. Nor is the Supreme Court *dicta* in a footnote in *Bryant*, which cites to this quote from *Giles*. *Bryant,* 131 S. Ct. at 1157 n.9.

#### b) Unreasonable Application of Clearly Established Supreme Court Law

The New York state courts unreasonably applied clearly established law by failing to objectively "evaluat[e] the statements and actions of [*all*] the parties to the encounter," *Bryant*, 131 S. Ct. at 1162 (2011) (emphasis added), as required by the confrontation clause. *See Duhs*, 947 N.E.2d at 619–20 (holding the child's statements to be nontestimonial because the physician's "primary purpose was to determine the mechanism of injury so she could render a diagnosis and administer medical treatment."). There was no "combined inquiry" of the interrogator's posture and that of the declarant. Rather, the court restricted its inquiry to the

purpose of the resident doctor as medical caretaker, rather than also considering her position as a compelled enforcer of state criminal and civil abuse of children and the possibility that the child conceived the inquiry as one to determine his own guilt.  *Id.*

When both the purpose of the physician and the child declarant are considered, it is apparent, as demonstrated below, that the testimony should not have been admitted.

(1)     The Declarant's Perspective

The child's purpose in making the statement he "would not let me out" is unclear and unreliable as proof of petitioner's guilt.  The child might not have observed why the scalding water rose in the tub.  Was a toy stuck in the drain, or was he trapped by his own heel?  Was his hand stuck in the drainage hole?  Did he, himself, plug the drain deliberately in some way, to help float a toy, causing the hot water to rise in the tub?

The resident doctor repeatedly asked the child leading questions about whether he jumped into the tub and why he did not get out of the tub.  Trial Tr. at 161:6–7 (Gold).  From the child's pauses, coupled with the somewhat accusatory tenor of the questions (did "he hurt himself?") it must objectively be concluded that the child might have feared that he himself would be punished for causing his own burns, or that he might be unfairly accused.  He may therefore have sought to shift blame to the only other person available, the petitioner.

The "Johnny" syndrome: "he did it, not I," is well-known among parents of children this age, and recognized in the scientific and academic literature.  *See Kennedy v. Louisiana*, 128 S. Ct. 2641, 2645, *as modified* (Oct. 1, 2008), *opinion modified on denial of* reh'g, 129 S. Ct. 1 (2008) (noting the "problem of unreliable, induced, and even imagined child testimony"); Stephen J. Ceci & Richard D. Friedman, *The Suggestibility of Children: Scientific Research and Legal Implications*, 86 Cornell L. Rev. 33, 36 (2000) (same); Brief of the Family Defense Center

and Other Advocates for Families as Amici Curiae in Support of Respondent ("Family Def. Ctr. Br.") at 16, *Ohio v. Clark*, No. 13-1352, *petition for cert. filed* (May 8, 2014) ("Whenever a young child is asked to give an account of past events, there is always a risk that the statements elicited will reflect the questioner's suggestion rather than the child's memory or experience."). Brief for the Innocence Network as Amicus Curiae in Support of the Respondent at 7, *Ohio v. Clark*, No. 13-1352, *petition for cert. filed* (May 8, 2014) ("Children, and young children in particular, are highly susceptible to suggestion."); Matthew H. Scullin *et al.*, *Measurement of Individual Differences in Children's Suggestibility Across Situations*, 8 J. Experimental Psychol.:Applied 233, 234 (2002) ("Studies have shown that large suggestibility effects can be found when children are confronted by a biased interviewer who barrages them with implicit and explicit suggestions, repetitions of questions, and the creation of expectations about what a proper answer should be.") (internal citations omitted); 2 Mod. Sci. Evidence § 17:33 (2014–2015 Edition) ("[I]f an interviewer suggests details that did not occur in an event, younger children would be expected to have greater difficulty remembering whether they had experienced or merely heard about those details of the event.").

The possibility of the child's lying, or at least misleading, is buttressed by the fact that he child did not appear to fully understand the difference between truth and falsity. When asked in the competency hearing to articulate the concepts, he simply focused on the consequences of lying, punishment. He, not the questioner, brought up idea of punishment. Pretrial Hr'g at 363:24–364:24 (child). *See* Part III.D *supra*. The specter of the child's own feelings of guilt or fear of his own possible punishment for his own conduct might well have been factors in his responses.

Regardless of the resident doctor's rationale, the Supreme Court requires that courts use

an "objective standard" to interpret the effect of her questions on the declarant. Here, an objective observer could find her questions accusatory and similar to those used by a police officer attempting to gather information for use in a possible prosecution. For a three-year-old, the resident doctor was arguably a "cop," an adult figure of authority with the power to punish. Nothing in the record indicates why she asked her questions, or even that she explained her reasons to the child. Nothing in the child's answers suggests any understanding that truthfulness would help him. The colloquy falls squarely within the realm of the kinds of interrogation that the confrontation clause, as now interpreted, is designed to keep out, unless the witness testifies.

The witness was available. It was the obligation of the prosecution to call the boy, and not the responsibility of the defendant. *See Melendez-Diaz*, 129 S. Ct. at 2540 ("[T]he [c]onfrontation [c]lause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court."). This burden was particularly significant given that the Assistant District Attorney said she would call the defendant. Pretrial Hr'g at 365:15–24 (Asst. District Attorney).

The child might have misperceived the situation. Petitioner told the mother that only after he started to free the child's hand, which was stuck in the overflow hole, did he realize the water was so hot. Trial Tr. at 88:6–12 (Andersen, S.). If the petitioner, unaware the water was scalding the child, initially held the child's arm or hand to free it, rather than pull the child from the tub, the child may have mistakenly perceived that petitioner was intentionally preventing him from getting out. This is a particularly strong possibility if the child had been bracing himself with the stuck hand in an effort to get out. *See* Family Def. Ctr. Br. at 17 ("[Y]oung children can misinterpret intentions of others[.]"); *see also Idaho v. Wright,* 775 P.2d 1225,1227–28 (Idaho 1989), *aff'd*, 110 S. Ct. 3139 (1990) (summarizing academic literature and testimony regarding

ability of children under five years of age and their inability to distinguish between a memory of something they imagined happened and a memory of what happened).

(2)     The Interrogator's Perspective

The New York Court of Appeals failed to fully account for the statutory role of the resident doctor in the state's law enforcement system. It accepted the resident's contention that her primary purpose was to give medical treatment, and that it was only a secondary, subsidiary purpose to act as a mandatory investigative reporter of possible child abuse.

Mandatory-reporting laws transform typical recipients of information about abuse into conduits for use by the government, including for criminal investigations and prosecutions. Brief of Amici Curiae Arizona Attorneys for Criminal Justice, Connecticut Criminal Defense Lawyers Association, and Iowa Association of Criminal Defense Lawyers in Support of Respondent ("States' Crim. Def. Att'y's Br.") at 7, *Ohio v. Clark*, No. 13-1352, *petition for cert. filed* (May 8, 2014); *see also* Elizabeth J. Stevens, *Deputy-Doctors: The Medical Treatment Exception After Davis v. Washington*, 43 Cal. W. L. Rev. 451, 476–77 (2007).

Here, the interrogating medical resident was a mandatory reporter of child abuse under New York Social Services Law § 413. It provides:

> The following *persons* and officials *are required to report* or cause a report. . .when they have reasonable cause to suspect *that a child coming before them in their professional or official capacity* is an *abused* or maltreated child, or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child: *any physician*. . . .

*Id.* (emphasis added).

52

The resident's purpose was, as a matter of law, in substantial measure, to fulfill her obligations to interrogate so she could report possible abuse. Failure to do so might have had serious adverse effects on her career. *Cf., e.g.*, *Djeddah v. Williams*, 932 N.Y.S.2d 60, 61 (N.Y. App. Div. 1st Dep't 2011) (finding a genuine issue of fact as to whether minor plaintiff's injuries were proximately caused by physician defendant's failure to report claims of physical and sexual abuse to proper authorities, as mandated by N.Y. Soc. Serv. Law § 413).

The resident doctor's purpose in asking the detailed questions she used to render medical treatment is somewhat dubious. She stated she wanted to conduct a neurological assessment. Once she heard the statement from the child that required reporting, she stopped questioning the child on the point. The circumstances of the questioning lend credence to the conclusion that her questioning emphasized her role as a law enforcer.

(3)    The Circumstances of Questioning

The colloquy between the resident doctor and the child took place approximately forty minutes after his admission to the pediatric emergency room. Trial Tr. at 159:25–161:5 (Gold). The scalding had taken place many hours before and first aid had already been provided. There was "no emergency in progress;" there was "no immediate threat to [the child's] person" requiring the information. *Davis*, 126 S. Ct. at 2278 (finding testimonial where witness, still at location of incident, spoke to police in separate room from her husband, who was attempting to intervene); *cf. id.* at 2276–77 (finding nontestimonial a call to 911 from victim's home under threat of physical force).

Neither the mother nor the petitioner was in the same area as the resident doctor and the child. Any conceivable danger from an attack on the child had passed. They were talking not about events as "*they were actually happening*" but "describ[ing] past events." *Id.* at 2276

53

(internal quotation marks omitted) (emphasis in original).

The child was answering these questions while in pain. Morphine had yet to be administered. The hospital staff was struggling to put in an intravenous line. That the child's recollection might have been subject to distortion was a clear danger.

### c) *Harmless Error Review*

The admission of the resident doctor's testimony, without the testimony of the child declarant, constituted both a serious mistake of law and an "unreasonable application" of "clearly established law," pursuant to 28 U.S.C. § 2254(d)(1). It was not harmless. The admission of the testimony had a substantial and injurious effect on the jury's verdict.

### (1)    The Statute: Assault in the First Degree

A finding of Assault in the First Degree, a felony, required the jury to find "intent" to harm by the petitioner:

> A person is guilty of assault in the first degree when:
>
> 1. With *intent* to cause serious physical injury to another person, he causes such injury to such person or to a third person
>
> by means of a deadly weapon or a dangerous instrument; or
>
> 2. With *intent* to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member
>
> or organ of his body, he causes such injury to such person or to a third person. . . .

N.Y. Penal Law § 120.10(1)–(2) (emphasis added). (The jury charge did not mention "depraved indifference," another ground for finding Assault in the First Degree. *See* Trial Tr. at 468:24–472:13; N.Y. Penal Law § 120.10(3)).

The detailed events of the morning of September 16 were never clarified at trial.  The tub itself was a hazard.  *See supra* Parts III.A, B & C.  The water was too hot and came out of the faucets too fast.  The bathtub had no fixed stopper.  There was an exposed drainage hole in the tub; on the outside of the bathtub, covering the hole, leaned an awkwardly placed plank of wood. There was space in between where things could get caught.  A pipe jutted up at angle.

The location of the child's toys at the time of the incident is unclear.  It is not known whether a toy got stuck in either of the two open holes, or whether the child's hand or hands or heel plugged a hole in the tub.  The pictures, taken hours after the incident, are unreliable.  The toys appear in different places in each of the photos, suggesting that they were moved while the photos were taken.  The detective and investigator's testimony about the number of toys in the bathroom is inconsistent with the pictures.

The government maintained that petitioner held the child down; but this story is not necessarily consistent with the child's burns on his feet: no burns on his left heel and second degree burns on his right heel.  The burn expert was never asked to square his opinion that the injuries were inflicted immersion injuries with this inconsistency.

The reasons behind the lack of splash marks were never pursued.  Neither doctor was asked nor explained whether, at some temperatures, splashed water could cool down, run off, or be shaken off before causing a burn, while immersed skin would still eventually suffer burns. Nor were they asked whether, if splashed water had caused some lesser redness or irritation, it might have healed or faded by the time Dr. Cooper examined the child a couple of days later and took photos that Dr. Ajl eventually examined.  Resident Dr. Gold, who examined the child on the

day of the injury, was not asked if she observed splash or runoff marks outside the areas she testified to.

(3)    Critical Importance of Child's Declaration

The jury did not hear from anyone who was actually present at the incident. The ten-year-old niece stated that, while en route to the hospital, the child said "Babe put me in hot water." Trial Tr. at 341:2–3 (Barbaria). This was a recitation of what was not disputed: the petitioner and the child were home alone. Petitioner placed the child in the bathtub. The water at one point was excessively hot. Mem. of Law in Reply and Further Supp. of Pet. 10–1, ECF No. 34. The ten-year-old niece's testimony of what petitioner said on the way to the hospital could have been clouded by the emergency and what she heard other adults say after the event. *See ,e.g.*, Gail S. Goodman *et. al.*, *Children's Eyewitness Memory: The Influence of Cognitive and Socio-Emotional Factors*, 19 Roger Williams U. L. Rev. 476, 490 (2014) (Children "may mistake information suggested to them for information obtained from actual experience."); Jennifer K. Ackil & Maria S Zaragoza, *Developmental Differences in Eyewitness Suggestibility and Memory for Source*, 60 J. Experimental Child Psychol. 57, 79–80 (1995) (young children are more susceptible than adults to conflating what they saw and what they heard); *cf.* Family Def. Ctr. Br. at 18–19 ("Once a child's account is tainted by improper interviewing techniques, it is often impossible to uncover the child's original account.").

The resident doctor relayed a statement, made by the three-year-old that could be interpreted as inculpating the defendant. She testified that the child said "he wouldn't let me out." Trial Tr. at 161:14–17 (Gold). This testimony was essential to the conviction.

On the felony charge, the only reason for petitioner's continuing confinement, the key question before the jury was intent, and of what kind. There was no dispute that the child

56

suffered significant injury, but there was a dispute as to whether petitioner intended to scald the child.  The difficulty in making this determination regarding intent may be evidenced by the fact that the jury was charged three times on the three degrees of assault.  Trial Tr. at 468:24–483:9.  *Cf. Wood*, 644 F.3d at 96 (length of jury deliberation indicated that case was a close call as to guilt).

(4)  Child's Declaration Not Cumulative

No person other than the child provided critical evidence of what occurred in the tub.  The resident doctor's testimony was not cumulative.  The testimony had to have had a substantial and injurious effect on the jury's proof of guilt.  Without the child's declaration, there was no proof of intent.  Petitioner should have been afforded the opportunity to cross-examine the child and ask questions such as: "Did Babe leave you alone in the bath when it had hot water in it?"  "Was there very hot water in the tub when you got in?"  "When Babe came back, was your hand in the hole?"  "Did Babe try to take it out?"

*d)*  *Policy Implications*

Respondent argues that the prosecution's failure to call the child to testify is justified because it was intended to "spare[] the child the torment" of testifying in open court.  Hr'g Tr. 68:7–15.  Respondent's counsel expressed concern about the broader implications of requiring child testimony in abuse cases making it difficult to protect children through the criminal law.  *Id.* at 68:24–69:5.

First, the child could have been called using protective devices equating to confrontation, such as closed circuit video.  The United States Supreme Court has held that "the use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the [c]onfrontation [c]lause."

*Craig*, 110 S. Ct. at 3167 (permitting child abuse victims to testify via one-way closed circuit television); *United States v. Giordano*, 172 Fed.App'x. 340, 343 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 1253 (2007) (summary order applying *Maryland v. Craig*); *see also United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999), *cert. denied*, 120 S. Ct. 931 (2000) ("Upon a finding of exceptional circumstances, such as were found in this case, a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice.");  *People v. Beltran,* 110 A.D.3d 153, 160 (N.Y. App. Div. 2d Dep't 2013), *leave to appeal denied*, 16 N.E.3d 1280 (N.Y. 2014) (child abuse victim determined to be a "vulnerable witness" and therefore allowed to testify via closed circuit television); *see also* Brief of Southwestern Law Student Bernadette M. Bolan, and Professors Norman M. Garland and Michael M. Epstein, in Association with the Amicus Project at Southwestern Law School, as Amici Curiae in Support of the Respondent at 22, *Ohio v. Clark*, No. 13-1352, *petition for cert. filed* (May 8, 2014) (noting that all but two states, Maine and North Dakota, by statute allow for children to testify via closed circuit television or other electronic means).

Some states allow children to bring "comfort items" into the court room to relieve anxiety. *See* Allie Phillips & Susanne Walters, *A Courtroom for All: Creating Child- and Adolescent-Fair Courtrooms*, National District Attorneys Association, National Child Protection Training Center & Gundersen Health System at 7 (2013), *available at*

*http://www.ndaa.org/pdf/A%20Courtroom%20for%20All%20monograph-rev2.pdf*.  *See also* States' Crim. Def. Att'y's Br. at 11–24 (arguing that the procedures put in place in Arizona, Connecticut and Iowa protect the rights of criminal defendants while allowing children to safely testify).

Second, the risk of psychological harm to the child cannot trump the right of a defendant

to constitutional protection under the due process and confrontation clauses.  The risk to the child cannot afford for "greater flexibility in the use of testimonial evidence."  *See Davis*, 126 S. Ct. at 2279–80 (rejecting argument for flexibility of evidence from victims of domestic violence).  "[C]onstitutional protections have costs."  *Coy v. Iowa*, 108 S. Ct. 2798, 2802 (1988).  "We may not . . . vitiate constitutional guarantees when they have the effect of allowing the guilty to go free."  *Davis*, 126 S. Ct. at 2280.

Third, although "[c]hild abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim," *Pennsylvania v. Ritchie*, 107 S. Ct. 989, 1003 (1987), there are "significant punishments and social stigmas," flowing from a conviction of child abuse.  Amicus Curiae Brief of the National Association of Criminal Defense Lawyers in Support of Respondent ("NACDL Br.") at 21, *Ohio v. Clark*, No. 13-1352, *petition for cert. filed* (May 8, 2014); *see also Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994) (noting, generally, stigma attached to child abuse conviction).  Risks of false conviction must be guarded against.

Cross-examination is a central means to "ascertain[] the truth" in child abuse cases, and to "secur[e] a just determination."  *See* Fed. R. Evid. 102.  A "face-to-face presence may, unfortunately, upset the . . . abused child; but by the same token it may confound and undo the false accuser, or reveal [that] the child [had been] coached by a malevolent adult."  *Coy*, 108 S. Ct. at 2802.  "[T]his category of testimony is *more* in need of the constitutional guarantee of reliability (confrontation), not *less*."  NACDL Br. at 21–2 (emphasis in original).

### e)  *Case Pending Before the United States Supreme Court*

The United States Supreme Court recently granted *certiorari* in *Ohio v. Clark*, 135 S. Ct. 43 (2014).  Oral argument is scheduled for March 2, 2015.  The case, on first blush, appears to

raise questions similar to those controlling in the instant case. *Certiorari* was granted to answer:

> 1) "Does an individual's obligation to report suspected child abuse make that individual
>
> an agent of law enforcement for the purposes of the [c]onfrontation [c]lause; and
>
> 2) Do a child's out-of-court statements to a teacher in response to the teacher's concerns
>
> about potential child abuse qualify as "testimonial" statements subject to the
>
> [c]onfrontation [c]lause?"

Brief of Petitioner at i, *Ohio v. Clark*, No. 13-1352, *petition for cert. filed* (May 8, 2014).

The instant case is distinguishable. While addressing the questions presented by *Ohio v. Clark* will provide the Court with an important opportunity to clarify a developing area of the law, the Court's holding will not necessarily affect the outcome here. Although the two cases implicate the confrontation clause, children's testimonial capacity, and mandatory reporters as law enforcement agents, they are factually distinct.

First, in *Ohio v. Clark*, the trial court ruled that the child declarant was *not* competent to testify. *See State v. Clark*, 999 N.E.2d 592, 595 (Ohio 2013). Here the trial court found the child declarant *competent* to deliver unsworn testimony. The prosecutor herself stated that she planned to call the child as a witness. Pretrial Hr'g at 365:20–24 (Asst. District Attorney).

Second, *Ohio v. Clark* involves a teacher questioning her student. Here, the interrogator was a medical professional, acting in the capacity of law enforcer. Although the child could not anticipate that his response would be used in a further legal proceeding, he could understand that it might lead to his punishment. For a three-year-old, the inquiry was equivalent to a police interrogation.

## VIII.  Conclusion

The context of this case is strikingly different from most criminal cases of child abuse by a parent's significant other, which often involve an angry or intoxicated defendant and a child who suffers repeated injuries in his or her care intentionally because of hostility.

Here, there are no indicia of anger or intoxication or past or present violence against the child or mother.  The mother had known the petitioner for more than a decade; she loved the petitioner.  He apparently returned that love.  There is no indication petitioner did not respond with love and affection for the child.  They lived together in a well-kept home.  The petitioner took good care of the child when the mother was at school.

The makeshift bathtub, replete with a hole perfect for a playful child's hand in which to get stuck, coupled with a water system that seriously overheated without warning, presented a danger waiting for an accident to happen.

At most, evidence admissible under the Constitution demonstrated that petitioner was negligent in his care for the three-year-old.  There is insufficient evidence of any intent to hurt the child.  Without the resident doctor's testimony relating the child's declaration—which should have been excluded under the confrontation clause—a jury could not find intent.

The petition for a writ of *habeas corpus* is granted.  28 U.S.C. § 2254 (2012).  Petitioner shall be released unless he is retried within 60 days of the completion of all appellate procedures.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated:  February 3, 2015
        Brooklyn, New York